## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILLIAM GUTHOERL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:05-0131** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **CITY OF MOUNT JULIET, TENNESSEE,** | ) | |
| **ROBERT G. SHEARER, City Manager of Mt.** | ) | |
| **Juliet, in his official and personal capacity,** | ) | |
| **and KENNETH D. MARTIN, Police Chief of** | ) | |
| **the City of Mt. Juliet in his official and personal** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM

This matter comes before the court on a Motion for Summary Judgment filed by the defendant City of Mt. Juliet (Docket No. 21), to which the plaintiff has responded (Docket No. 42) and the defendant has replied (Docket No. 62). In addition, this memorandum will consider the Motions for Summary Judgment filed by defendant Robert G. Shearer (Docket No. 33), and by defendant Kenneth D. Martin (Docket No. 34), to which the plaintiff has not responded, as well as the Motion to Deem Admitted Plaintiff's Responses filed by defendant City of Mt. Juliet (Docket No. 58), to which the plaintiff also did not respond. For the reasons discussed herein, the defendants' summary judgment motions will be granted, and this case dismissed.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff William Guthoerl worked as a dispatcher for the Mt. Juliet Police Department.[1] Guthoerl was on shift on October 6, 2004, when a call came in from Laramie County, Wyoming. The caller identified himself as Detective Zukauckas and told Guthoerl that his office had an outstanding warrant for a resident of Mt. Juliet, whose name was Michael Richardson. Richardson was wanted by the state of Wyoming for practicing dentistry without a license.

Over the next two days, Guthoerl closely followed the department's attempts to serve this warrant and investigated—as well as he could, from his dispatcher's desk—Richardson's comings and goings in Mt. Juliet. Meanwhile Michael Richardson, through his lawyer, arranged to turn himself in to the Wyoming authorities. In the ensuing confusion, Guthoerl came to believe that something went wrong in the service of this warrant. Guthoerl believed that Richardson had gotten a "heads-up" from the City Manager, defendant Robert G. Shearer, and might very well have taken flight. Guthoerl claims to have been fired for airing those suspicions to Detective Zukauckas and investigator Joe Jones. The official reason for his termination, which occurred on December 1, 2004, was that he lied to his superiors in an unrelated incident. Michael Richardson surrendered voluntarily to the Cheyenne, Wyoming authorities on October

---

[1]Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint (Docket No. 1, attach. Compl.), the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 54), plaintiff's Affidavit (Docket No. 56), and the plaintiff's Response in Opposition to Motion for Summary Judgment (Docket No. 48).

Because plaintiff did not respond to defendant Robert G. Shearer's Statement of Undisputed Material Facts (Docket No. 33, Ex. 2), or defendant Kenneth D. Martin's Statement of Undisputed Material Facts (Docket No. 41), each fact in those statements must be deemed admitted pursuant to Local Rule 8(b)(7)(g), except where they directly contradict the one response the plaintiff did file, directed solely to the city of Mt. Juliet's statement of undisputed facts (Docket No. 54), as further discussed below.

2

11, 2004, and later pled guilty to a single count of misleading advertising. (Docket No. 33, Ex. 5 at ¶ 7.)

Before further discussing the facts of this case, we must resolve an issue involving the operation of Local Rule 8(b)(7). Pursuant to Rule 8(b)(7)(c), defendants city of Mt. Juliet, Robert Shearer, and Kenneth Martin each submitted statements of undisputed material facts. Because plaintiff Guthoerl did not respond to Shearer's or Martin's statements, the facts in those statements are deemed admitted, pursuant to Rule 8(b)(7)(g). However, where a fact admitted under operation of Rule 8(b)(7)g contradicts plaintiff's Response to the City of Mount Juliet's Statement of Undisputed Material Facts, we must follow plaintiff's Response, in order to draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Yet, as pointed out by the city of Mt. Juliet, the plaintiff did not dispute very many facts in his response, (*See* Docket No. 59), and therefore, the plaintiff's failure to respond to defendant Shearer's and defendant Martin's Statements of Undisputed Material facts has caused less conflict in the record than might have been expected. The plaintiff's responses to the city of Mt. Juliet's statements 9, 13, 15, 19, 24, 27, 28, 35, 37, 39, 41, 42, 44, and 46, however styled, do not actually dispute those statements. (*Id.*) However, the response to statement 49 does dispute that statement as contemplated in Rule 8(b)(7)(c). The court will treat statement 49, "[t]he termination of Guthoerl did not result from his October 7, 2004, telephone conversation with Detective Zukauckas or his October 13, 2004 conversation with Joe Jones," as disputed for purposes of Rule 8(b)(7).

With those conclusions in mind, we return to the facts. After he received Detective Zukauckas' call on October 6, Guthoerl contacted Corporal Chris Cunningham and told him

3

about the outstanding Wyoming warrant for Michael Richardson. Cunningham and another officer then went to Richardson's home in order to arrest Richardson. Richardson was not at home, but his wife and daughter were. Mrs. Richardson told the officers that her husband was out running errands, while the daughter admitted that her father was, in fact, a dentist. (Docket No. 30, Ex. 4.) Cunningham decided against telling Mrs. Richardson the purpose of his visit and returned to the station. Before he departed, Mrs. Richardson told Cunningham that her husband was acquainted with the city manager, Defendant Shearer.

Later that day, at the station, Guthoerl routed a call from Richardson to Corporal Cunningham. Richardson asked why officers had been dispatched to his home. Corporal Cunningham refused to say, but repeated that he needed to speak with Richardson in person and that he needed to see him that afternoon. Richardson responded that he could not come that afternoon but that he would surrender himself the next day at 7:00 a.m. Richardson asked to speak with the police chief, defendant Kenneth D. Martin. Cunningham said that Chief Martin was unavailable and the call ended. Soon thereafter, Chief Martin called Corporal Cunningham at the station via cell phone to discuss the service of this warrant. Cunningham and Martin debated whether or not to tell the city manager, Defendant Shearer. Against Cunningham's wishes, Chief Martin called Shearer and told him about the warrant. Shearer then called Richardson and told him that he was wanted by the Wyoming authorities and should turn himself in to the police.

Guthoerl learned this information from Cunningham and was troubled. Guthoerl and Cunningham guessed that Richardson would not return home, so Guthoerl attempted to locate Richardson's office, with no success. (Docket No. 28, Ex. 1 at 18-22.) Guthoerl researched

4

Richardson's driving records and performed searches in Tennessee dental registries. (Docket No. 28, Ex. 1 at 33-99.) In performing a vehicle search, Guthoerl learned that Richardson owned several "high dollar vehicles," a discovery he later repeated to Detective Zukauckas. (Docket No. 30, Ex. 4 at 1); (Docket No. 28 Ex. 2.) In the midst of Guthoerl's investigation, Richardson called the station a second time and asked to speak with Chief Martin. (Docket No. 28, Ex. 2 at 4-12.) As dispatcher, Guthoerl answered the call and told Richardson that Martin was unavailable. (*Id*.) Although Richardson left Guthoerl his number, Guthoerl does not recall leaving a message for Chief Martin. (*Id*.) Guthoerl returned to his investigations.

That same afternoon, after Guthoerl's shift had ended, an attorney called the Mt. Juliet police station on behalf of Richardson. The attorney, Gary Vandever, and the officer with whom he spoke agreed that Richardson could voluntarily surrender himself at the station the following day. (Docket No. 33, Ex. 5 at ¶ 3.) Vandever also put in a call to the Wyoming authorities to negotiate his client's surrender. (*Id*. at ¶ 4.)

Guthoerl did not know about Vandever's calls. When he arrived at work on October 7, 2004, he was still very concerned about arresting Richardson. (Docket No. 30, Ex. 4 at 1.) Detective Zukauckas appears to have called the Mt. Juliet police station that morning. Guthoerl told Zukauckas that the department had been unable to serve the warrant and that "it turns out, this guy is quaky [sic]." (*Id*.) Guthoerl stated, "this guy happens to be close friends with our city management . . . and apparently some communication was made between him and the chief . . . and the city manager called him and told him 'Hey, the police are trying to get you. There's a warrant for you,' so he was supposed to surrender himself by 7 o'clock this morning. We have yet to see him or hear from him. We have no clue where he's at." (*Id*.)

5

Zukauckas asked if anyone was out looking for Richardson. Guthoerl said that officers had gone to Richardson's house, but not found him there. Next Guthoerl described some of the investigative work he had performed the day before. (*Id*.) Guthoerl said, "[N]ow that he knows that we are looking for him and what it's about . . . I don't foresee him returning to his residence. I mean, he's got a vast amount of money. He's got a lot of nice vehicles, I mean, a lot of high dollar vehicles and lives in a very high part, high end . . . part of the city, so you know, I hate that happened . . . . Unfortunately, he was somebody that knew somebody in a political position. Kind of got a heads up." (*Id*. at 1-2.) Detective Zukauckas asked to be referred to the Tennessee Bureau of Investigation and Guthoerl gave him the number. (*Id*. at 2.)

Meanwhile, Richardson's attorney, Gary Vandever, was making arrangements with different authorities in Wyoming for Richardson's voluntary surrender. It was agreed that Richardson would surrender himself in Cheyenne, Wyoming, on October 11, 2004. (Docket No. 33, Ex. 5 at ¶ 5.) The Wyoming authorities agreed to take no further action to serve the warrant against Richardson, provided that he showed up on October 11. (*Id*.) Vandever called the Mt. Juliet police department on the afternoon of October 7 and told them about the agreement. (*Id*. at 6.) He appears not to have spoken with Guthoerl. (*Id*.) All went according to plan, and Richardson surrendered on Monday, October 11, 2004. (*Id*.) He ultimately pled guilty to a charge of "misleading advertising," and paid $630 in fines and costs to the state of Wyoming to close the affair. (*Id*. at 7.)

But the affair did not end in Mt. Juliet. At some point after Richardson surrendered, the Sheriff of Wilson County contacted District Attorney General Tommy Thompson, for the 15th Judicial District of Tennessee, requesting an investigation. Thompson asked Joe Jones, a

criminal investigator, to determine whether any Mt. Juliet city officials acted inappropriately in the Richardson matter. Joe Jones spoke with several city employees, including Guthoerl. Guthoerl told Jones that Chief Martin had told Shearer about the warrant, that Shearer had told Richardson, and that doing so had been improper. Joe Jones concluded that there was no evidence of any criminal activity. He concluded that Richardson was not a flight risk and that he had been told about the warrant "for the purpose of making arrangements for him to surrender himself directly to the Wyoming authorities." (Docket No. 25, Ex. 2 at ¶ 8, 9.) According to Jones, "[i]t is not uncommon for law enforcement to notify persons of the existence of outstanding warrants so that they may surrender themselves." (*Id*. at ¶ 11.) It is also Jones' opinion that Guthoerl's statements to Zukauckas, on the morning of October 7, 2004, were "inappropriate statements which indicate a lack of experience and judgment." (*Id*. at ¶ 13.) The District Attorney General's Office closed the matter.

Guthoerl continued to work as a dispatcher. Six weeks later, Guthoerl became involved in a new controversy at the station. Officer Matthew Bryson, a personal friend of Guthoerl's, reported that he was attacked one night while on duty and suffered a head injury. Bryson reported that he had not recognized the attacker, who had fled the scene. It was subsequently determined that Bryson had filed a false report, and Bryson was criminally indicted. During the criminal investigation, Captain Don Hamblen asked Guthoerl whether Bryson had a girlfriend, as it was suspected that an extramarital affair may have been the cause of the attack. (Docket No. 27, Ex. 2 at ¶ 4.) Guthoerl responded that Bryson did not have a girlfriend. Hamblen doubted that Guthoerl was being truthful and told Chief Martin and Assistant Chief Winston Floyd about his doubts. Guthoerl maintains that he did not know of any girlfriend Bryson may have had.

Case 3:05-cv-00131   Document 65   Filed 05/22/06   Page 7 of 23 PageID #: 924

On the night of November 24, 2004, Guthoerl and Bryson were seen removing items from Bryson's patrol car. It was reported that, though he was not on duty, Guthoerl was wearing his hand gun and that Bryson appeared intoxicated. When asked what they were doing, Guthoerl reportedly told an officer that he had Chief Martin's permission to remove the items from the car. When told of this, Chief Martin said that he had given Guthoerl no such permission. Guthoerl and Bryson were told to leave the station. Guthoerl contends that Bryson told him that they had Chief Martin's permission and that he had believed Bryson.

Carrie Paris, Guthoerl's supervisor, was told about Guthoerl's two allegedly dishonest statements on November 29, 2004. That day, Paris drafted a letter recommending that Guthoerl be terminated. The letter was forwarded to Assistant Chief Floyd, who joined in the recommendation. Defendants Chief Martin and Robert Shearer both agreed that Guthoerl should be terminated and, on December 1, 2004, Shearer terminated Guthoerl.

On February 17, 2005, Guthoerl filed this action alleging: (1) retaliatory discharge in violation of Tenn. Code Ann. § 50-1-304 (The Tennessee Public Protection Act); (2) retaliatory discharge in violation of Tenn. Code Ann. § 8-50-603, *et seq* (The Public Employee Political Freedom Act); and (3) discharge in violation of his First Amendment Rights under 42 U.S.C. § 1983. On February 1, 2006, defendants City of Mt. Juliet, Kenneth Martin, and Robert Shearer each filed separate motions for summary judgment. (Docket Nos. 21, 33, 34.)

## **ANALYSIS**

8

## I.        Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000).  Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'"  *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law.  *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).  To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving

9

party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II. Tennessee Public Protection Act

The Tennessee Public Protection Act ("TPPA") states: "No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(a). The statute defines "illegal activities" as "activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(b). As the plaintiff has himself admitted, it was not illegal for defendant Shearer to have told Richardson about the warrant; in fact, it is common practice for police officers to advise a person of the existence of an outstanding arrest warrant. (Docket No. 54 at ¶ 27, 28.) The plaintiff maintains that it was not customary for defendants Martin or Shearer to involve themselves in the service of a warrant, but he does not argue, nor can he, that doing so violated any "criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(b). Therefore the

10

plaintiff's claim under the TPPA must be dismissed as a matter of law.  *See Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 345 (Tenn. Ct. App. 1997) (holding that where the conversation at issue did not describe any "illegal activities," no action under the TPPA could be maintained).

### III.    Public Employee Political Freedom Act

The Public Employee Political Freedom Act ("PEPFA") states:  "It is unlawful for any public employer to discipline, threaten to discipline, or otherwise discriminate against an employee because such employee exercised that employee's right to communicate with an elected public official."  Tenn. Code Ann. § 8-50-603.

The court first notes that, regardless of the merit of plaintiff's PEPFA claim against the City of Mt. Juliet, he cannot state a claim under PEPFA against defendant Martin or defendant Shearer in their individual capacities.  The Tennessee courts have held that PEPFA applies to public entities and not to the "individual discriminator."  *Pewitt v. Buford*, No. 01A01-9501-CV-00025, 1995 WL 614327 at *4-5 (Tenn. Ct. App. Oct. 20, 1995) ("[t]he imposition of liability upon the 'public employer,' as opposed to the 'individual discriminator,' is plain, clear, and unambiguous"); *see also Baines v. Wilson County*, 86 S.W.3d 575, 582-83 (Tenn. Ct. App. 2002) (applying the rule announced in *Pewitt* to a similar statute distinguishing between liability against government entities and liability against supervisors employed by that entity).  Therefore, the PEPFA claims against defendants Martin and Shearer in their individual capacities must be dismissed.

The City of Mt. Juliet argues that the plaintiff's PEPFA claim must fail because he never spoke to an "elected public official."  In fact, the plaintiff did not speak with the elected District Attorney General, but instead to his investigator, Joe Jones.  However, the parties have not

11

directed this court to any Tennessee case law—nor has this court discovered any—addressing whether or not the term "elected public official" should include agents directed by an elected official to perform a task. And, because this claim fails on an alternative ground, this court need not engage in this first impression analysis.

Instead, plaintiff's PEPFA claim against the City of Mt. Juliet must be dismissed for failure to show causation between the alleged communication with a public official and the plaintiff's actual termination. In *Pewitt*, the court noted that "[o]bviously, the word 'because' in [Tenn. Code Ann.] § 8-50-603(b) requires that the discriminatory actions of the public employer must have resulted from the employee's communication with an elected official." 1995 WL 614327 at *5. In that case, the court held that there was a genuine issue of material fact with regard to causation, in part because the plaintiff's supervisor had been heard to say, "If I find out for sure that it was Judy [the plaintiff] . . . I am going to fire her ass." *Id*. at *6. By way of contrast, in *Sloan v. Tennessee Bureau of Investigation*, 670 S.W.2d 227, 228-29 (Tenn. Ct. App. 1984), the court found that causation had not been shown. In Sloan, the "discipline"—a transfer to another office—was decided before the plaintiff contacted any public officials, and on that basis, the court concluded, "[t]here [was] no evidence in the record that plaintiff was transferred to Johnson City from Savannah because he communicated with a public official." *Id*. at 229. Unfortunately, in neither *Pewitt* nor *Sloan*, nor any other PEPFA case this court has discovered, has a test or standard for causation been articulated. The plaintiff here has offered no evidence of threatening statements such as in *Pewitt*, but neither did the adverse employment action take place before the communication was made, as in *Sloan*. It is therefore necessary for us to look at standards of causation in other employment-related causes of action in Tennessee.

12

To show causation for retaliatory discharge under the Tennessee common law, "the plaintiff must present some proof other than merely the facts showing her employment, her exercise of rights . . . and her subsequent discharge." *Reed v. Alamo Rent-A-Car*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) (citing *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992). In addition, "[t]he plaintiff's subjective beliefs or speculation are insufficient to create the requisite causal relationship." *Reed*, 4 S.W.3d at 685; (citing *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (holding, in an age discrimination case, that mere personal beliefs, conjecture, and speculation were insufficient to demonstrate causation)). Similarly, in a cause of action under the Tennessee Human Rights Act ("THRA"), the plaintiff can only meet her burden by "presenting direct evidence of a causal link, such as where the employer was acting pursuant to an established policy or where the employer admitted the reason for the termination, or by presenting compelling circumstantial evidence." *Austin v. Shelby County Government* 3 S.W.3d 474, 481 (Tenn. Ct. App. 1999) (holding that a causal link did not exist where remarks by a supervisor indicated personal animus against the plaintiff but did not indicate that the animus arose from the plaintiff's prior lawsuit against the company). Those cases square with the causation requirement in Title VII, where the plaintiff must show at least "some evidence to deduce a causal connection between the retaliatory action and the protected activity." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal citations omitted).

The plaintiff here has provided no evidence indicating that he was fired in retaliation for speaking with Joe Jones. First, it is important to identify what the plaintiff told Joe Jones. The plaintiff wrote a summary of events on October 7, 2004 that he showed to Joe Jones during his

13

interview. (Docket No. 30, Ex. 6.) That summary describes the undisputed events that occurred on October 6, 2004 and does not include the plaintiff's subjective impressions, such as that Richardson had received a "heads up" and was unlikely to turn himself in. The plaintiff shared those impressions with Detective Zukauckas, and apparently not with Joe Jones. The plaintiff has not argued that his conversations with Detective Zukauckas are protected by PEPFA, nor could he: there is no evidence in the record that Detective Zukauckas is an elected official, nor that he was acting on behalf of one. Moreover, in as much as the plaintiff's statements to Zukauckas that the department had not heard from Richardson and had "no clue" where he was, they would not be protected by PEPFA, even if Zukauckas had been an elected official. *See Robbins v. Johnson City*, No. E2000-02952-COA-R3-CV, 2001 WL 767020 at *6 (Tenn. Ct. App. July 3, 2001) (holding that PEPFA does not prohibit "disciplining [an employee] for communication untrue allegations" even where the employee "may have believed them to be true").

It appears from the record that, in addition to reading Jones his statement, the plaintiff told Jones that he thought too many people were involved in the service of the warrant and that the suspect should not dictate how he will surrender. (Docket No. 54 at ¶ 22;) (Docket No. 29, Ex. 5 at 40.) The record does not reveal any other statements, and we must conclude that there were no others.

The parties agree that defendant Shearer cooperated fully with the investigation and that Jones interviewed several department employees in addition to the plaintiff. The plaintiff does not allege that he was ever discouraged from meeting with Jones, nor does he allege that any other employees were discouraged from meeting with Jones. At his meeting with Jones, the

14

plaintiff expressed personal disapproval of the warrant service process and otherwise recounted the facts that occurred on October 6, 2004. The plaintiff does not allege that he told Jones of any wrongdoing on the part of the defendants, which in fact squares with Jones' conclusion that no criminal activity occurred. In sum, the plaintiff contends that he was fired for participating in an investigation that defendant Shearer cooperated with, that included many other employees, and that ultimately exonerated the defendants. Moreover, the plaintiff does not allege that he accused either Shearer or Martin of any wrongdoing during that investigation.

The plaintiff does allege that, after he was terminated, negative evaluations were placed in his personnel file. Although this evidence might indicate that those evaluations were pretextual, it does not show that the plaintiff was fired in retaliation for speaking with Joe Jones. The plaintiff has proffered no evidence that he was fired for speaking with Jones, aside from his own belief that he was fired for that reason. That belief is not enough. At the very least, the plaintiff must offer "some" evidence that his termination was caused by his conversation with Jones. *See, e.g., EEOC v. Avery*, 104 F.3d at 861; *Reed*, 4 S.W.3d at 685; *Austin v. Shelby,* 3 S.W.3d at 481. In the absence of such evidence, we must dismiss the plaintiff's PEPFA claim.

## IV.    First Amendment Claim

Finally, the court will address the plaintiff's First Amendment claims brought under 42 U.S.C. § 1983. Section 1983 provides a federal cause of action for violations of constitutional rights by public officials acting under color of law. *Lomaz v. Hennosy*, 151 F.3d 493, 500 (6th Cir. 1998). To assert a valid § 1983 claim, a plaintiff must demonstrate (1) a deprivation of a right secured by the Constitution (or a law of the United States), and (2) that the deprivation was caused by someone acting under color of state law. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir.

15

2003) (citing *Perry v. McGinnis*, 209 F.3d 597, 603 (6th Cir. 2000). Because the plaintiff has not shown the deprivation of a constitutional right, his § 1983 claim must fail.[2]

The plaintiff alleges that his termination from public employment deprived him of his right to free speech as guaranteed by the First Amendment. The First Amendment does protect public employees from termination in retaliation for protected speech. *Connick v. Myers*, 461 U.S. 138, 145 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968) ("[t]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected") (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 605-606 (1967)). However, not all speech is protected speech. The state maintains the ability to fire employees for a wide variety of verbal conduct. As the Supreme Court held in *Connick*, 461 U.S. at 146, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Accordingly, the Sixth Circuit has acknowledged that, "[w]hile public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers*, 344 F.3d at 596 (citing *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 475 n. 21 (1995)

---

[2]Defendants Martin and Shearer assert the affirmative defense of qualified immunity against the plaintiff's § 1983 claim. Because the plaintiff has not identified the deprivation of a constitutional right, the court need not analyze this defense. *See Silberstein v. City of Dayton,* 440 F.3d 306, 320 (6th Cir. 2006).

16

(internal citations omitted).

The Supreme Court has instructed courts to engage in a three-step inquiry to determine whether a public employer has violated the First Amendment through an adverse employment action. First, the court must decide whether the speech at issue addressed a matter of public concern. *See Connick*, 461 U.S. at 143. Second, the court must weigh the public employee's interest, as a citizen, in "commenting on matters of public concern" against the interest of the state, as an employer, in "promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Third, the court must determine "whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee." *Rodgers*, 344 F.3d at 596 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1997).

### A.    A Matter of Public Concern

The court must first determine whether the plaintiff's speech addressed a matter of public concern. In so doing, the court must consider "the content, form, and context of a given statement, as revealed by the whole record." *Rodgers*, 344 F.3d at 596 (quoting *Connick*, 461 U.S. at 147-48); *see also Langford v. Lane*, 921 F.2d 677, 680 (6th Cir. 1991). Whether or not the speech involves a "matter of public concern" turns on whether it "involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government," *Rodgers*, 344 F.3d at 596 (quoting *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)). Protected speech under this analysis "includes informing the public that a governmental entity failed to discharge its governmental responsibilities, or bringing to light actual or potential wrongdoing or breach of

17

public trust." *Rodgers*, 344 F.3d at 596 (quoting *Connick*, 461 U.S. at 148). In contrast, "internal personnel disputes or complaints about an employer's performance" do not implicate the First Amendment in employee discharge cases. *Brandenburg*, 253 F.3d at 898. In other words, if the plaintiff spoke in part as a citizen, concerned—rightly or wrongly—that his department was not fulfilling its public duties, he should be able to pass this hurdle. However, if he spoke only as an employee, disgruntled with "incompetent management," then he has failed. See, e.g., *Rodgers*, 344 F.3d at 595 ("the employee's entire speech does not have to focus on matters of public concern so long as some portion of the speech does so").

In *Rodgers*, the Sixth Circuit addressed whether or not an internal memo protesting the abrogation of patient privacy in a public hospital was protected speech under *Pickering* and *Connick*. *Rodgers*, 344 F.3d at 600-01. In holding that the speech passed the first prong of the analysis, the court reasoned that "the focus of [the memo] [was] on patient care" and not "to air employment-related grievances." *Id.* at 600. The court explained that the memo focused mostly on policy, detailing the allocation of space and listing three reasons why the new allocation was a poor decision. *Id.* Two out of the three reasons were "patient oriented." *Id.*

Although it is a close case, the court finds that the plaintiff's speech did address a matter of public concern. Guthoerl's statements to Zukauckas and to Joe Jones cannot have been purely related to his own employment, because serving warrants was not Guthoerl's responsibility as a dispatcher. Guthoerl's interest in the serving of the warrant seems to have been, on the contrary, entirely unrelated to his duties. During his October 6, 2004 conversation with Zukauckas, Guthoerl stated: "now that he knows that we are looking for him and what it's about . . . I don't foresee him returning to his residence. I mean, he's got a vast amount of money. He's got a lot

18

of nice vehicles, I mean, a lot of high dollar vehicles and lives in a very high part, high end . . . part of the city, so you know, I hate that happened . . . Unfortunately, he was somebody that knew somebody in a political position.  Kind of got a heads up."  (Docket No. 30, Ex. 4 at 1-2.) In his conversation with Joe Jones, Guthoerl said that he thought too many people had been involved in the serving of the warrant, and that the accused should not dictate how he will turn himself in. Whether Richardson had been given a "heads up" and allowed to escape to the hills seems to have resonated with Guthoerl's sense of justice or spurred him to action in some other way, it is unclear.  It did not have much to do with his own job, which involved conveying information to police officers.  In as much as Guthoerl cannot have been wearing his employee hat when he smelled something amiss, he must have been wearing his citizen hat.  However confused or misguided Guthoerl's concerns were, they seem to have arisen from his interests as a citizen.

   **B.     A Balancing of the Parties' Interests**

   The plaintiff fares less well on the second prong, which requires that his interest as a citizen be balanced against the state's interest in "promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.  In performing this analysis, the court must "consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees."  *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994).  Guthoerl's comments to Detective Zukauckas seem to have done at least a few of those things.

   In *Connick*, the Supreme Court held that a questionnaire, though it contained one question

that was a matter of public concern, could not outweigh "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." 461 U.S. at 150. The questionnaire, which had been passed out in the office during work hours, had caused a "mini-insurrection," causing not only Myers but other employees to leave their work. *Id*. at 151-52. Accordingly, the Court held that "[t]he limited First Amendment interest involved" in the questionnaire did not compel the government to "tolerate action which [it] reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Id*. at 154.

Guthoerl's comments to Detective Zukauckas seem to have caused a similar level of disruption. Unlike the plaintiff in *Connick*, it cannot be said that Guthoerl caused a "mini-insurrection;" however, he did inspire an investigation into what turned out to be a fairly normal, legal police procedure. That investigation cost significant time and money and took several employees, along with Guthoerl, away from their work. Guthoerl's quest to find Richardson's place of business seems to have distracted him from, among other things, leaving Richardson's message with Chief Martin, surely a responsibility of his position. Had Chief Martin received that message, some confusion might have been avoided. Guthoerl's implication to Zukauckas that Richardson had been given a "heads-up" by the City Manager and Chief of Police, and might be hiding from the authorities, caused unnecessary concern on the part of Zukauckas and may have created tensions between two cooperating departments. In the words of investigator Joe Jones, Guthoerl made "inappropriate statements which indicate a lack of experience and judgment." (Docket No. 25, Ex. 2 at ¶ 13.) The state's prerogative in the efficiency of its police force must allow it to discipline dispatchers who create confusion in this manner. Therefore,

20

Guthoerl's conversation with Detective Zukauckas does not pass the second prong of the analysis. *See, e.g., Langford*, 921 F.2d at 682 ("[w]hen an employee has complained to co-workers that their manager has 'done her dirty,' the manager obviously has a legitimate interest in resolving the problem").

Guthoerl's conversation with Joe Jones is another matter, however. In his meeting with Jones, Guthoerl seems to have only recounted the undisputed events that occurred on October 6, 2004, and to have said that he thought too many people had been involved in serving the warrant, and that the accused should not dictate the terms of surrender to the police. Voicing such concerns to an investigator, in a private meeting, would not "meaningfully interfere" with Guthoerl's job duties or sow discontent in the department. It is arguably in the state's interest that public employees should participate fully in such investigations, even when the investigation was spurred by that very employees' irresponsible statements. Therefore the court will analyze Guthoerl's conversation with Jones under the third prong.

### C.    A Substantial or Motivating Factor

To establish the third prong, the plaintiff must show that his speech was a "substantial" or "motivating" factor in the employer's decision to fire him. *Mt. Healthy*, 429 U.S. at 287 (1997); *see also Langford*, 921 F.2d at 680. As discussed above, the plaintiff has offered no evidence tending to show that his discharge was caused by his participation in Jones' investigation. Therefore he cannot pass the third bar, and his § 1983 claim must fail.

The Supreme Court explained in *Mt. Healthy*:

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. . . . A

21

> borderline or marginal candidate . . . ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision. 429 U.S. at 285-86.

In *Langford*, 921 F.2d at 680, the Sixth Circuit applied that language to dismiss a First Amendment § 1983 action on the third prong, where the plaintiff had a history of disciplinary problems at work. *See also Kreuzer v. Brown,* 128 F.3d 359, 363-64 (6th Cir. 1997); *but see Rodgers*, 344 F.3d at 603 (holding that, where the employer admitted that the employees' speech played a role in the decision, the issue of causation needed to be tried by a jury); *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988).

In the present case, as discussed above, the plaintiff has offered no evidence tending to show that his conversation with Joe Jones was a "substantial" or "motivating" factor in the department's decision to fire him. Moreover, the defendants have documented a convincing alternative basis for the decision: they believe that Guthoerl lied to his superiors at work. Captain Don Hamblen, who was absent from the Richardson warrant incident, believed that Guthoerl was dishonest in answering questions regarding his friend, Officer Matthew Bryson, who was at the time under criminal investigation. (Docket No. 27, Ex. 2 at ¶ 4.) Then, on November 24, 2004, Guthoerl was found, with Bryson, removing items from Bryson's patrol car. Bryson appeared to be intoxicated, and Guthoerl told another officer that they had permission to be on the premises, which they did not have. Reviewing both of these incidents, Carrie Paris, who was also not involved in the Richardson warrant matter, recommended that Guthoerl be fired. Defendant Martin agreed with the recommendation, and defendant Shearer fired Guthoerl.

The plaintiff has offered evidence that older disciplinary records were placed in his

personnel file after he was dismissed. That evidence may tend to undermine those reports, but it does not affect the undisputed evidence that Carrie Paris recommended that he be terminated for his dishonesty. It certainly does not link his termination in any way with his conversation with Joe Jones. The plaintiff has offered no other evidence linking the two events, aside from his own assertions. As in *Langford*, a reasonable jury, viewing all of the evidence in the plaintiff's favor, could not fail to conclude that the plaintiff was fired for his subsequent misconduct, and not for speaking with Jones. Accordingly, this court must dismiss the plaintiff's First Amendment claim under § 1983.

## **CONCLUSION**

For the reasons stated herein, defendant City of Mt. Juliet's, defendant Kenneth Martin's, and defendant Robert Shearer's Motions for Summary Judgment will each be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

23